**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PRINCESS DEMPSEY,<br><br>Plaintiff,<br><br>v.<br><br>WHITE CASTLE SYSTEMS, INC. and LESLIE KUJAT,<br><br>Defendants. | Case No. 24 C 577<br><br>Hon. LaShonda A. Hunt |

**MEMORANDUM OPINION AND ORDER**

Self-represented Plaintiff Princess Dempsey sued her former employer White Castle System, Inc.[1] and former District Manager, Leslie Kujat (collectively "Defendants"), after her termination. Following discovery, Defendants moved for summary judgment on all remaining claims, (Dkt. 114); Plaintiff then moved to strike affidavits that Defendants submitted with their reply brief, (Dkt. 137). For the reasons stated below, Plaintiff's motion to strike is denied, and Defendants' motion for summary judgment is granted.

## I. BACKGROUND

Before detailing the facts, the Court will address some evidentiary issues relating to Plaintiff's motion to strike. Defendants argue that some of the evidence that Plaintiff submitted with her response in opposition to summary judgment should be excluded because Plaintiff did not disclose it during discovery. (Reply at 1211-1216, Dkt. 132)[2]. One such item is an audio recording

[1] In her amended complaint, Plaintiff incorrectly named Defendant White Castle System, Inc. as "White Castle Systems, Inc." (*See* Dkt. 41 at 224 n.1).

[2] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document.

of a phone conversation between Plaintiff and another White Castle employee, Aris Compton. In support of their argument that the audio recording should be excluded, Defendants submitted two affidavits with their reply brief, one from Ms. Compton, and another from Kate Trudell, one of Defendants' counsel of record. In her affidavit, Ms. Compton states that she did not consent to being recorded during that conversation. (Compton Aff. ¶ 6, Dkt. 132-5). Attorney Trudell states that they asked Plaintiff for the recording in discovery and that Plaintiff sent a link to the recording that was broken and never provided a functioning link despite additional requests. (Trudell Aff. ¶¶ 2-8, Dkt. 132-2). Defendants also contend that the audio recording is inadmissible regardless of its late disclosure because it was created in violation of the Illinois Eavesdropping Act, 720 ILCS 5/14-1 *et seq.* (Reply at 1212-1213). Plaintiff counters that Attorney Trudell's and Ms. Compton's affidavits should be excluded because they were not disclosed in discovery. (Mot. to Strike at 1290-1291).

Plaintiff's motion to strike is denied because her position is illogical—the testimony of Ms. Compton and Attorney Trudell could not have been disclosed during discovery given that it responds to Plaintiff's submission of the audio recording with her post-discovery opposition brief and Defendants did not have the audio recording in advance. As to the recording itself, Defendants are partially correct that it is inadmissible under the Illinois Eavesdropping Act (regardless of whether Plaintiff disclosed it in discovery). The Illinois Eavesdropping Act prohibits a person from knowingly and intentionally using "an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation." 720 ILCS 5/14-2(a)(2). The Act defines "surreptitious" as "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g). Because the Act is

a state law, evidence obtained in violation of it is not admissible to prove state-law claims. *Century Consultants, Ltd. v. Miller Grp., Inc.*, No. 03-3105, 2005 WL 3108455, at *1 (C.D. Ill. Nov. 18, 2005) (citing *Glinski v. City of Chicago*, No. 99 C 3063, 2002 WL 113884, at *5-7 (N.D. Ill. Jan. 29, 2002)). The Act does not govern the admissibility of evidence for federal claims, though. *See Marcial v. Rush Univ. Med. Ctr.*, No. 16 C 6109, 2018 WL 4237474 (N.D. Ill. Aug. 30, 2018) ("Courts in this district have held that the Illinois Eavesdropping Act does not affect the admissibility of evidence in federal civil suits where federal substantive law provides the rule of decision."); *see also United States v. D'Antoni*, 874 F.2d 1214, 1218 (7th Cir. 1989) (explaining with respect to federal criminal case that "as long as the tape-recorded conversations are admissible under federal law, which they are here, they are admissible in federal court, even though they might not have been admissible in state court."). Generally, federal law only requires that one party consent to a recorded conversation. 18 U.S.C. § 2511(2)(d).

Because Ms. Compton did not consent to being recorded during her phone conversation with Plaintiff, and Plaintiff did not tell her that the conversation was being recorded, (Compton Aff. ¶ 6), the Court finds that the recording violated the Illinois Eavesdropping Act and is therefore inadmissible to advance Plaintiff's state-law claims, *see Century Consultants*, 2005 WL 3108455, at *1. With respect to Plaintiff's federal claims, the Court will consider the recording notwithstanding its late disclosure as well as the other evidence Defendants seek to exclude since doing so does not change the outcome.

### A. Factual Background

The facts are taken from the parties' Local Rule 56.1 statements and the evidence in the record.[3] *See* Fed. R. Civ. P. 56(c)(3). Neither party fully complied with Local Rule 56.1, and as a result, made the Court's task much more difficult. Plaintiff failed to cite evidentiary support for her disagreements with Defendants' asserted facts as required by Local Rule 56.1(e)(3); provided more than 40 additional factual statements without leave of Court, in violation of Local Rule 56.1(d)(5); and failed to support all of her factual statements with citations to the record as required by Local Rule 56.1(d)(2). In addition, many of Plaintiff's factual statements contain legal argument, in violation of Local Rule 56.1(d)(4), and some are not supported by the evidence cited.

Defendants violated Local Rule 56.1(g) in their summary-judgment memorandum by, at times, citing the raw evidence instead of their Local Rule 56.1 statement when addressing facts. Defendants also assert facts in their memorandum that are not included in their Local Rule 56.1 statement.[4]

"The Court may require strict compliance with Local Rule 56.1 from all parties," *Williams v. Burke*, 814 F. Supp. 3d 935, 938 (N.D. Ill. 2026) (collecting cases), including self-represented parties, *Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009). As such, the Court deems Defendants' factual statements admitted and will consider Plaintiff's first 40 factual statements only. Any argumentative factual statements, factual statements lacking citations, or factual statements without evidentiary support within the first 40 will not be considered. Nor will the Court consider

---

[3] The Court will refer to Defendants' statement of facts, (Dkt. 114-1), as "DSOF"; Plaintiff's response to Defendants' statement of facts, (Dkt. 123), as "R-DSOF"; Plaintiff's statement of additional facts, (Dkt. 128), as "PSOAF"; and Defendants' response to Plaintiff's statement of additional facts, (Dkt. 133), as "R-PSOAF."

[4] For example, in their memorandum, Defendants contend that in the spring of 2023 an "employee reported that Plaintiff was unprofessional and often yelled at staff and called them derogatory names." (Mem. at 712, Dkt. 114-2). In support of this fact, Defendants cite paragraph 12 of their Local Rule 56.1 statement, which only says, "In April 2023, White Castle received a complaint from one of Plaintiff's team members." (DSOF ¶ 12).

those facts asserted in Defendants' memorandum that are missing from their Local Rule 56.1 statement, as "the Seventh Circuit has stressed[ that] facts are to be set forth in Rule 56.1 statements." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 508 (N.D. Ill. 2011)). Given both sides' non-compliance with Local Rule 56.1 and the fact that both factual statements omit helpful details[5], the Court will do its best to clearly recount the material facts in this matter, even though "it is not the role of the Court to parse the parties' exhibits to construct the facts." *Bobak Sausage*, 805 F. Supp. 2d at 508.

### 1. **Plaintiff's Employment at White Castle**

Plaintiff, a Black woman, was employed by White Castle from June 2019 to January 2024. (DSOF ¶ 1; Pl.'s Dep. at 726, Dkt. 114-4). On her first day, Plaintiff signed White Castle's Biometric Information Privacy Team Members Consent Form. (R-PSOAF ¶ 21; Biometric Consent Form, Dkt. 114-4).

Sometime in the spring of 2020, Plaintiff began working as an Assistant General Manager (AGM). (*See* DSOF ¶ 2). In a June 2020 performance review, Plaintiff received an overall rating of 3.13 out of 5 for her performance the preceding year. (*Id.*; Pl.'s Dep. at 728). Plaintiff's reviewer commented that in the two months Plaintiff worked as an AGM, she showed great progress. (DSOF ¶ 2). Plaintiff received a 3.03 rating for her performance in 2020. (*Id.* ¶ 3). Plaintiff's reviewer rated her as "needs improvement" in Supervision/Leadership and in Cooperation. (*Id.*).

White Castle promoted Plaintiff to General Manager in May 2021. (*Id.* ¶ 4). Plaintiff initially managed White Castle #38 in Villa Park, Illinois. (Pl.'s Dep. at 730, Dkt. 114-4). For her first year as a General Manager, Plaintiff received a performance rating of 3.5 overall. (DSOF ¶ 6).

---

[5] As an example, one of Defendants' factual statements is "Mr. Montemayor never reported to District Manager Leslie Kujat." (DSOF ¶ 39). Nowhere in their Local Rule 56.1 statement do Defendants provide Mr. Montemayor's full name, describe who he is, or explain what he has to do with this case.

Sometime later, Plaintiff left White Castle #38 and became the General Manager of White Castle #51 in Hoffman Estates, Illinois. (Pl.'s Dep. at 731). Defendant Leslie Kujat was the District Manager and Plaintiff's immediate supervisor at White Castle #51. (DSOF ¶ 7). Ms. Kujat is Black. (*Id.* ¶ 8). Plaintiff received a performance review from Kujat in March 2023, where Ms. Kujat rated Plaintiff's performance 3.0 overall and commented:

> Princess your positive energy is great in the castle. Princess stay consistent using the stars report and have realistic sales when forecasting and teach your team to use the daily plan. Work on following up with your team on training and follow through on achieving goals a train team [sic] will help reduce negative customer complaints. Recognize that your team performance depends on your overall castle results and that everyone is responsible for their actions. Continue to work on sanitation of the castle appearance. Continue to hiring [sic] one out of ten to get your castle staff so that you can succeed this 2023.

(*Id.* ¶ 9).

During Plaintiff's tenure as General Manager at White Castle #51, it received customer complaints.[6] (*Id.* ¶ 11). In addition, White Castle received complaints from two of Plaintiff's team members, one in April 2023, and another in June 2023.[7] (*Id.* ¶¶ 13-14). On July 12, 2023, White Castle issued Plaintiff a "Second Written Warning" Disciplinary Action Form for "Inefficiency/Failure to Perform." (Kujat Aff., Ex. F at 809-810, Dkt. 114-4).

On August 5, 2023, Ms. Kujat sent an email to Plaintiff communicating various concerns about her work performance. (DSOF ¶ 15). Ms. Kujat said,

---

[6] Plaintiff objects to this asserted fact as hearsay. (R-DSOF ¶ 11). Her objection is overruled because the fact that customers submitted complaints is not hearsay, and Plaintiff herself testified that she received customer complaints while at White Castle #51. (Pl.'s Dep. at 732).

[7] The Court overrules Plaintiff's improper hearsay objections to these asserted facts as well. (*See* R-DSOF ¶¶ 12-13).

> Good Morning Princess.
>
> I appreciate the time yesterday to discuss the concerns I have witnessed at Chic #51. It is your responsibility as a GM to support and encourage open communications between our team members and any member of management as outlined in our Open Door Policy. I do not feel that you are creating this type of environment at your castle from what I have directly observed when I visit the location. One of the main responsibilities of a GM is to create a culture of engagement where team members feel comfortable and happy to come to work. I expect to see immediate and sustained improvement in this area. I will be monitoring your progress in living our values of being Family Inclusive and creating a positive team member experience in your castle.
>
> Please reply to this email so that we are in agreement with the expected behavioral changes outlined above.

(*Id.*). Plaintiff sent the following response two days later:

> AS I thank your for your visit however I strongly disagree with you on this matter , MY team and Manager know I have an open door policy, I've always thank them for coming to work, I also try to make it as a fun place, on many occasion when you arrive at the location.. I've notice that my team stop talking and it gets tense in the air.. I don't see them laugh as much, But I do know they call want to respect you as a district. Some of them said to me that when you arrived I can be helping them on Floor and laugh with them and you would call me away, leaving them alone and they think I'm being discipline ,do you know how many times they ask me.. Am I okay,?? Am I good??? on many occasion I had to explain, to my team what your job is as a district. So, what you observe is they are not the same when you come around at all. And when you leave I have to regroup them. I have to explain that I am okay and it will be okay. Even with the new team members had made comments. There not afraid of me they like being here that why they expect the job to work at White Castle, Even when it comes to the schedule as i stated to them I can create it but I don't have the final approval, it goes before my district for review and to make sure we are making labor but also have coverage for the store. I am very easy to talk to and my team and my manager stated they don't have a problem. So maybe here a thought when you arrive at the castle, let them see me and you engage and show that we are partner and make positive comments , like great store, Sales looking good , this will help them know that we are getting alone too.. People watch us too.. So, again I thank you for your concern please understand this was my concern

> too. Also FYI when you're here and on the phone talking about another castle they are listening to that too. So be mindful this also reflect so in the future if we have any issues with White Castle, if a team member not setting the grill right, or drop to many fries.. Hopefully it can be dressed in a positive and respectful manner.. Again, this was the concern that I had and may bless day.

(*Id.* ¶ 16).

About a day later, on August 8, 2023, Plaintiff contacted Team Service Manager Ben Spies to file a complaint about an incident that she said occurred back on June 22, 2023, at White Castle #48. (*Id.* ¶ 17). Plaintiff alleged that Ms. Kujat punched her in the arm. (*Id.*). Following his conversation with Plaintiff, Mr. Spies commenced an investigation into her complaint. (*Id.* ¶ 18). His investigation included interviews with Ms. Kujat and Ms. Compton, the General Manager there, as well as review of the surveillance video from White Castle #48. (*Id.*). Mr. Spies ultimately concluded that Kujat did not punch Plaintiff.[8] (*Id.* ¶ 26).

On August 10, 2023, White Castle began looking into a customer complaint that it received on August 8, 2023. (*Id.* ¶ 21). To investigate this complaint, Mr. Spies partnered with District Supervisor Manny Thakkar. (*Id.*). As part of the investigation, Mr. Thakkar spoke with a White Castle #51 employee who shared that Plaintiff had not ensured that White Castle #51 had adequate supplies, was not honest with her employees, got mad at the employees, and was otherwise bullying and intimidating. (*Id.* ¶ 22). The employee also told Mr. Thakkar that they were fearful of what would happen if Plaintiff found out that they were speaking up. (*Id.* ¶ 23).

When asked about the complaint by Ms. Kujat, Plaintiff denied that White Castle #51 had run out of supplies but blamed an employee for not notifying her in a timely manner. (*Id.* ¶ 24; *see*

---

[8] Plaintiff's hearsay objection (R-DSOF ¶ 26) to this fact is overruled because it merely describes the outcome of Mr. Spies' investigation, which is not hearsay.

Kujat Aff., Ex. E (Supplies Email), Dkt. 114-4). Ms. Kujat, however, reviewed a text message communication between Plaintiff and the employee which showed that Plaintiff had notice that supplies were low. (DSOF ¶ 24).

On August 31, 2023, White Castle issued a Final Warning to Plaintiff and placed her on a Performance Improvement Plan (PIP). (*Id.* ¶¶ 27-28). A PIP "is a tool that White Castle uses to give a team member that is not meeting expectations the opportunity to succeed while still holding them accountable for past performance." (*Id.* ¶ 29). Plaintiff's PIP was scheduled to run for 90 days, through November 29, 2023. (*Id.* ¶ 30). Ms. Kujat met with Plaintiff on the 30-day mark, October 6, 2023, to review Plaintiff's progress on the PIP and scheduled a follow-up meeting for November 6, 2023. (*Id.* ¶ 32).

On November 4, 2023, White Castle received two customer complaints about Plaintiff's store. (*Id.* ¶ 32; Kujat Aff. ¶ 18, Dkt. 114-4). Both customers complained that the store was not clean, about the wait times for their orders, and that their orders were incorrect. (DSOF ¶ 32). Two days later, Plaintiff met with Ms. Kujat and Mr. Thakkar for her follow-up meeting. (*Id.* ¶ 33).

A few days after that, Plaintiff took leave under the Family and Medical Leave Act (FMLA) starting on November 9, 2023. (*Id.* ¶ 34). White Castle extended Plaintiff's PIP to account for her absence while on FMLA leave. (*Id.* ¶ 36).

Plaintiff's FMLA leave ended on December 5, 2023. (*Id.* ¶ 34). On December 13, 2023, John Whitaker, White Castle's Regional Director of Restaurant Operations for the Chicago Region, sent Plaintiff an email "letting [her] know how much [he] appreciate[d] [her] efforts." (Resp., Ex. E at 1049-1050, Dkt. 124). He stated, in part:

> Our Chicago region is shaping up to have a record year (both Sales and NP) and Castle #51 has helped in that regard. We continue to grow people, sales, profits and you're an important part of our success. I certainly recognize the challenges and obstacles you and the team faced in 2023, but at the same time proud of the way you battled through.

(*Id.* at 1050). He also congratulated Plaintiff on her "GOLD Score Card."[9] (*Id.*).

On January 9, 2024, White Castle terminated Plaintiff. (*Id.* ¶ 37). The termination form stated:

> Plaintiff was placed on a 90 day PIP in September of 2023. After careful consideration and review of your performance improvement plan it has been determined that you have not met the required performance standards as outlined in the plan. Despite the support and resources provided to assist you in improving your performance, there has been insufficient progress made.

(Kujat Aff., Ex. N (Termination Form), Dkt. 114-5). After being terminated, Plaintiff sent an email to White Castle's President, Lisa Ingram, asserting, in general, that she had been mistreated and was placed "under attack" after she reported that Ms. Kujat punched her. (Resp., Ex. E at 1051, Dkt. 124). On January 11, 2024, White Castle Management Company's Senior Director of People and Culture sent Plaintiff an email saying that she would be looking into Plaintiff's allegations and following up with Plaintiff about the investigation. (*Id.* at 1052). According to Plaintiff, no one ever followed up with her. (R-PSOAF ¶ 17).

On January 23, 2024, Plaintiff filed a police report regarding Ms. Kujat's alleged punch. (DSOF ¶ 38). A case report narrative concerning Plaintiff's report states that Ms. Kujat was charged with "Battery/Physical contact" and "released with a cite and notice form." (Resp., Ex. G, Dkt. 124). The Court is unaware of the status of Ms. Kujat's charges.

---

[9] Neither party explains what a "gold" scorecard is, but from what the Court can glean, it relates to the performance of Plaintiff's store. (*See* Resp., Ex. F at 1055-1066, Dkt. 124).

2. **Other Employees' Performance**

Chesta Desai worked as General Manager of White Castle #48 in 2023. (DSOF ¶ 42). She is Indian, and she reported to Leslie Kujat. (*Id.* ¶¶ 41, 43). Ms. Kujat issued the 2023 Team Member Scorecard to Ms. Desai, and Ms. Desai received a 4.5 out of 5 for her overall performance in calendar year 2022. (*Id.* ¶ 44). The only identified opportunity in the 2023 Team Member Scorecard Appraisal for Ms. Desai was encouragement to focus on hiring to grow her White Castle into a 24-hour location. (*Id.* ¶ 45). In 2023, Ms. Desai was recognized as the Chicago District's General Manager of the Year. (*Id.* ¶ 51).

White Castle #48, under Ms. Desai's management, complied with all areas identified by the health department's Food Establishment Inspection as it pertained to Foodborne Illness Risk Factors and Public Health Interventions in 2023. (*Id.* ¶ 46). White Castle #51, under Plaintiff's management, was out of compliance with 11 out of 44 of the health department's Food Establishment Inspection factors. (*Id.* ¶ 47).

3. **Profit Sharing and Incentive Bonus**

White Castle offers a profit-sharing incentive plan for its General Managers. (*See* Whitaker Aff., Ex. A (Incentive Plans), Dkt. 114-5). To be eligible for a payout, an individual must have worked at least 50% of the year as a General Manager. (*Id.* at 962, 965, 967). Incentive plan awards "are distributed approximately six weeks following the end of the year measured." (*Id.*). Both historically and contractually, the incentive award is not made prior to January 9th of any year. (DSOF ¶ 64). "Participants terminated for cause prior to receiving the incentive award are not eligible to receive the incentive award even if they would have otherwise qualified." (Incentive Plans at 962, 965, 967).

Plaintiff received a copy of White Castle's incentive plan when she became a General Manager. (DSOF ¶ 62). Her paystubs reflect that for 2021 and 2022, Plaintiff's incentive award was included in the pay period of the last week of January the following year. (*Id.* ¶ 63).

Diana Knox, White Castle's Retirement Benefits Manager, is responsible for submitting profit-sharing disbursement requests from previous and current employees to Principal Solutions, White Castle's third-party trustee. (Knox Aff. ¶ 5, Dkt. 114-4). On July 29, 2025, Ms. Knox received a completed disbursement request from Plaintiff and submitted it to Principal Solutions. (DSOF ¶ 56). Principal Solutions processed the payment for the balance of Plaintiff's profit-sharing account on August 27, 2025, and mailed a check to her via USPS, which Plaintiff cashed. (*Id.* ¶¶ 57, 58).

**B. Procedural History**

On January 23, 2024, Plaintiff filed this lawsuit against White Castle and Ms. Kujat. She amended her complaint on April 18, 2024, asserting seven claims: battery under Illinois law (Count III)[10], *respondeat superior* (Count IV), "retaliation and whistleblower" (Count V), racial discrimination (Count VI), wrongful termination (Count VII), violation of "biometric system" (Count VIII), and "unpaid wages and incentives" (Count IX). (First Amended Complaint (FAC), Dkt. 24). In May 2024, Defendants moved to dismiss Counts IV, V, VI, and VII. (Dkt. 29). The Court granted the motion as to Counts IV and V but denied it as to Counts VI and VII. (Dkt. 41). Accordingly, Plaintiff's battery, wrongful termination, BIPA, and "wages of incentives" claims remain after discovery.

[10] Plaintiff's original complaint contained claims of excessive force (Count I) and intentional infliction of emotional distress (Count II). (Dkt. 8). However, her amended complaint does not include those claims, so it begins with Count III. (Dkt. 24).

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" and a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *id.* at 324, and support their position with "more than a scintilla of evidence," *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is the time for a litigant to "put up or shut up" by "show[ing] what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotation marks omitted) (quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020)). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, all "justifiable" inferences are drawn in favor of the non-moving party. *Anderson*, 477 U.S. at 255. Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Finally, "[s]peculation cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

## III. **DISCUSSION**

Before addressing the merits, the Court observes that Plaintiff's response brief includes citation errors that are emblematic of the use of generative artificial intelligence. Plaintiff offers citations to cases that do not exist. (Resp. at 990, 992, 996, Dkt. 122) (purporting to cite *Singletary v. Ill. Dep't of Corr.*, 804 F.3d 828, 834 (7th Cir. 2015); *Kast v. Telerent Leasing Corp.*, 831 F.2d 1251 (7th Cir. 1987)). Plaintiff attributes a quote to *Goelzer v. Sheboygan County*, 604 F.3d 987, 995 (7th Cir. 2010) that is not in the opinion. (Resp. at 993). Moreover, Plaintiff cites *Johnson v. City of Fort Wayne*, 91 F.3d 922 (7th Cir. 1996) for the proposition that the U.S. Equal Employment Opportunity Commission's issuance of a notice of right to sue to her "confirms that her claim is legitimate and not frivolous," (Resp. at 991), but *Johnson* does not support that proposition, which is inaccurate, *see Hansen v. Illinois*, No. 17 C 3256, 2018 WL 6834698, at *3 (C.D. Ill. Dec. 28, 2018) ("The EEOC makes no determination of the validity of any claim when it issues a right to sue letter. . . . The right to sue letter does not tend to prove any element of Hansen's claims.").

Although self-represented litigants are not held to the same standards as lawyers, *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999), by filing a document with the Court, "both attorneys and unrepresented parties are certifying 'that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,' the 'factual contentions have evidentiary support' and the 'legal contentions are warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law,'" *Jones v. Kankakee Cnty. Sheriff's Dep't*, 164 F.4th 967, 970 (7th Cir. 2026) (quoting Fed. R. Civ. P. 11(b)(2), (3)). Accordingly, Plaintiff is reminded that she "must read [her] filings and take reasonable care to avoid misrepresentations, factual and legal." *Id.* This is especially true if Plaintiff uses generative artificial intelligence. *See SEC v. Nantomah*, No. 25-CV-1130-PP, 2026

WL 252451, at *3 (E.D. Wis. Jan. 30, 2026) (noting that generative AI is known to produce inaccurate citations and misrepresent the law). Additional filings with inaccurate citations or legal misrepresentations may result in the imposition of sanctions under Federal Rule of Civil Procedure 11. *See id.* at *4. ("Filing a document that contains citations to nonexistent cases or that quotes language that does not appear in a cited case violates Rule 11 because it demonstrates that the filing party has not made a reasonable inquiry into the supporting law.").

The Court now turns to Plaintiff's claims.

**A. <u>Battery (Count III)</u>**

Count III, Plaintiff's battery claim, concerns the alleged punch by Ms. Kujat. (FAC at 103). She brings this claim against White Castle and Ms. Kujat. (*Id.*).

The Court notes that both parties seemingly confuse a civil battery claim with the criminal offense of battery. Plaintiff's amended complaint cites 720 ILCS 5/12-3, (FAC at 104), which is the Illinois criminal battery statute, *Collins v. City of Chicago*, No. 21 C 02913, 2024 WL 5007836, at *19 (N.D. Ill. Dec. 6, 2024) (noting that 720 ILCS 5/12-3 provides "the statutory definition of *criminal* battery, which is distinct from the civil battery tort"). Plaintiff also argues in her response brief that "[m]inimal physical contact may constitute battery if it is, insulting, provoking, or retaliatory," but she relies on a criminal case for that proposition. (Resp. at 991) (citing *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55). Similarly, Defendants quote *Torf v. Chicago Transit Auth.*, 405 Ill. App. 3d 379, 385 (1st Dist. 2010), for the proposition that Plaintiff must prove that Ms. Kujat "[wa]s consciously aware that such [harmful] result is practically certain to be caused by h[er] conduct." (Mem. at 705-706) (alterations in original) (internal quotation marks omitted). The court in *Torf* was describing the intent required to prove criminal battery. 405 Ill. App. 3d at

385. Accordingly, neither party's legal arguments about Plaintiff's battery claim are entirely accurate or helpful.

In any event, in Illinois, the tort of battery is generally defined "as the unauthorized touching of the person of another." *Sekerez v. Rush Univ. Med. Ctr.*, 2011 IL App (1st) 090889, ¶ 42 (citing *Curtis v. Jaskey*, 326 Ill. App. 3d 90, 93 (2d Dist. 2001)). That said, "[n]ot every unconsented contact is a battery." *Liner v. FCA US LLC*, No. 18 C 6163, 2021 WL 4244750, at *6 (N.D. Ill. Sept. 17, 2021). To constitute battery, the unconsented contact "must be of a harmful or offensive nature."[11] *Id.* (citing *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 622 (7th Cir. 1989)). Under the doctrine of *respondeat superior*, "[a]n employer may be liable for a battery committed by one of its employees 'only when the employee's acts were committed within the scope of his employment.'" *Doe v. Bd. of Educ. of City of Chicago*, 611 F. Supp. 3d 516, 545 (N.D. Ill. 2020) (quoting *Doe ex rel. Doe v. Lawrence Hall Youth Servs.*, 2012 IL App (1st) 103758, ¶ 26).

Plaintiff maintains that Ms. Kujat punched her. (Resp., Ex. T (Pl. Aff.) ¶¶ 9-10).[12] Ms. Kujat, on the other hand, denies punching Plaintiff. In an affidavit, Ms. Kujat states that she was sitting in the White Castle #48 dining room with Plaintiff when she received a notification on her phone about the Titanic tourist submersible that was missing at the time.[13] (Kujat Aff. ¶¶ 30-32).

---

[11] The intent required for civil battery in Illinois is not exactly clear. In the Illinois case law, there is "legal support as to both whether the intent element of battery requires intent to touch, or the arguably more difficult-to-prove intent to cause a harmful or offensive contact." *Bakes v. St. Alexius Med. Ctr.*, 2011 IL App (1st) 101646, ¶ 23. The difference is immaterial in this case, though, because Plaintiff's claim fails regardless.

[12] The Court notes that Plaintiff's affidavit includes legal conclusions. (*See, e.g.*, Pl. Aff. ¶ 32) ("The timing, shifting explanations, and disparate treatment of other employees show that White Castle's statement reason for my termination was **pretextual**."). Because "affidavits are for stating facts, not legal conclusions," the legal conclusions are disregarded. *Greene v. Westfield Ins. Co.*, 963 F.3d 619, 627 (7th Cir. 2020) (citing Fed. R. Civ. P. 56(c)(4)); *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded.").

[13] *See generally* Morgan Windsor, *A timeline of the missing Titanic tourist submersible*, ABC News (June 27, 2023, 5:56 PM), https://abcnews.com/International/missing-titanic-tourist-submersible-timeline/story?id=100265183

According to her affidavit, Ms. Kujat said, "Oh my God. I wish they can find them," and then Plaintiff said something to the effect of "that's what rich white people do." (*Id.* ¶¶ 33-34). Ms. Kujat states that she "instinctively intervened by tapping [Plaintiff] on the arm" and that her "sole intent was to halt the offensive commentary and protect [Plaintiff] from jeopardizing her employment." (*Id.* ¶ 37).

Defendants produced surveillance video of the interaction between Plaintiff and Ms. Kujat, although the video is very pixelated. (*See* Spies Aff., Ex. E (Surveillance Video), Dkt. 118). The video starts with Plaintiff sitting at a table in the While Castle #48 dining room. (*Id.* at 0:00:00). After about a minute, Ms. Kujat walks over to the table and sits next to Plaintiff on her right. (*Id.* at 0:00:00-0:00:56). Someone else is sitting at a table nearby. (*Id.*; *see* DSOF ¶ 20). A minute and a half later, Ms. Kujat extends her right arm out toward Plaintiff and, in an arch-like motion, raises it and then brings it down near Plaintiff's left shoulder. (Surveillance Video at 0:00:00:56-0:02:34). The video is too pixelated to show any further detail. After that, Plaintiff and Ms. Kujat stand up from the table and exit the restaurant. (*Id.* at 0:02:34-0:02:49). A third person, apparently Aris Compton, appears as they are walking out and exits the building with them. (*Id.*).

Based on the evidence here, a reasonable jury could find that Ms. Kujat intentionally touched Plaintiff's arm on June 22, 2023. Ms. Kujat herself admits that she "tapp[ed] [Plaintiff] on the arm." (Kujat Aff. ¶ 37). A reasonable jury could also find that Plaintiff did not consent to the touching; Defendants do not argue that Plaintiff did. (*See* Mem. at 705-707). However, Plaintiff has not produced sufficient evidence from which a reasonable jury could find that the contact was harmful or offensive and therefore amounts to battery. Plaintiff does not contend that Ms. Kujat injured her. Plaintiff argues that she has "consistently described the contact as unwelcome and demeaning, creating a factual dispute for the jury." (Resp. at 991). But Plaintiff's subjective

opinion, standing alone, is insufficient to create a triable issue. Indeed, contact is "offensive" if it "offends a *reasonable* sense of personal dignity." *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1090 (1995) (emphasis added) (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 19 (1965)).

Even when construing Plaintiff's *pro se* submissions liberally and drawing all reasonable inferences in her favor, Plaintiff has failed to present evidence from which a reasonable jury could conclude that the incident occurred as described. Although Plaintiff has offered evidence that Ms. Kujat was cited for criminal battery, Plaintiff has not offered evidence that she was *convicted* of the charge. And, critically, the video of the incident does not necessarily reflect Plaintiff's version of events. *See e.g.*, *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape."). At best, the surveillance video shows that Ms. Kujat lightly hit or tapped Plaintiff's arm, but not in a manner that any reasonable jury would describe as "harmful or offensive." *Liner*, 2021 WL 4244750, at *6. Without more, there is no triable issue for the jury with respect to Plaintiff's battery claim, and Defendants are entitled to summary judgment on Count III.

**B. <u>Racial Discrimination (Count VI)</u>**

Count VI complains of racial discrimination claim under Title VII of the Civil Rights Act of 1964, (Resp. at 994), which prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race," 42 U.S.C. § 2000e-2(a)(1). Although it is not clear, the Court presumes that Plaintiff brings this claim against White Castle only because individual employees (like Ms. Kujat) cannot be held liable under Title VII. *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995).

In Title VII cases, "an unlawful employment practice is established when the [plaintiff] demonstrates that race . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). A plaintiff may prove race discrimination using the traditional burden-shifting test articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the more holistic approach set out by the Seventh Circuit in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Defendants reference both standards, so the Court will analyze Plaintiff's claim, construed as one against White Castle, under *McDonnell Douglas* and *Ortiz*.

**1. *McDonell Douglas* Burden-Shifting Framework**

The *McDonnell Douglas* framework first requires a plaintiff to establish a *prima facie* case of discrimination by showing that "(1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). If a plaintiff is successful in doing so, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer can articulate such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki*, 988 F.3d at 957 (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

Plaintiff's claim fails under the *McDonell Douglas* framework because she cannot establish a prima facie case. As Defendants note, Plaintiff cannot show that she was meeting White Castle's legitimate expectations nor that a similarly situated employee outside of her protected class received better treatment. (Mem. at 714-716). There is no dispute that leading up to Plaintiff's

termination, White Castle received complaints from customers about Plaintiff's store, complaints about Plaintiff from her subordinates, and that Plaintiff received two written warnings and then was placed on a PIP. (DSOF ¶¶ 11, 13-14, 21, 27-26). Plaintiff argues that she was disciplined more harshly than two non-Black White Castle employees, Chesta Desai and Stacy Casey, (Resp. at 995), but Plaintiff has not shown that these employees were similarly situated to her.

Where, as here, a "plaintiff claims that [s]he was disciplined by h[er] employer more harshly than a similarly situated employee based on some prohibited reason[,] a plaintiff must show that s[he] is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000), *overruled on other grounds by Ortiz*, 834 F.3d at 765. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*; *see Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016) ("The similarly-situated inquiry is a flexible one, but we frequently consider whether the employees in question had the same job description, were subject to the same standards, had the same supervisor, and had comparable experience, education, and other qualifications.").

As to Stacey Casey, Plaintiff states in her affidavit that Ms. Casey was a General Manager "under the same General Manager" who "engaged in similar or worse performance conduct but w[as] not placed on [a] PIP[] or terminated" and that "Ms. Casey managed a 'Red Castle' store in 2022 that had multiple poor performance indicators yet was not disciplined." (Pl. Aff. ¶ 14-15). These conclusory statements have no support in the record and are insufficient to show that Ms. Casey was similarly situated to Plaintiff. Although a plaintiff may rely on a self-serving affidavit to create a factual dispute, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013), such affidavits

must be based on personal knowledge and have factual support in the record, *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004). Because Plaintiff has failed to support her statements about Ms. Casey with evidence, they do not create a triable factual dispute.

Plaintiff asserts that Ms. Desai also "engaged in similar or worse performance conduct but w[as] not placed on [a] PIP[] or terminated" and that she "participated in similar product transfers but was not disciplined." (Pl. Aff. ¶¶ 14, 16). But again, these statements are unsupported by the record. In fact, Plaintiff's first statement contradicts the evidence in the record, which shows that Ms. Desai received a higher performance rating than Plaintiff for calendar year 2022, that her store performed better than Plaintiff's in a 2023 health inspection, and that Ms. Desai was recognized as the General Manager of the Year for White Castle's Chicago District in 2023. (DSOF ¶¶ 9, 44-47, 51). In short, Plaintiff has failed to show that she was meeting White Castle's legitimate expectations or that she was treated less favorably than similarly situated employees. Consequently, her racial discrimination claim fails under *McDonnell Douglas*. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) ("Since [plaintiff] did not put forth sufficient information about similarly situated employees outside of his class that were treated more favorably, his discrimination claim fails under the *McDonnell Douglas* framework."); *Miller v. Univ. of Chi.* No. 5 C 1663, 2007 WL 317028, at *8 (N.D. Ill. Jan. 29, 2007) ("Plaintiff has failed to establish that he has met his employer's reasonable expectations and has therefore failed to establish a prima facie case for discrimination based on race.").

**2. *Ortiz***

*Ortiz* instructs that "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766. Stated differently:

> Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or

> whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

*Id.* at 765. In applying *Ortiz*, the standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . *caused* the discharge or other adverse action." *Id.* (emphasis added). The Seventh Circuit has identified "ambiguous or suggestive comments or conduct," "better treatment of people similarly situated but for the protected characteristic," and "dishonest employer justifications for disparate treatment" as "three broad types of circumstantial evidence that will support an inference of intentional discrimination." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).

Even after drawing all reasonable inferences in Plaintiff's favor, the Court concludes that the evidence in the record "as a whole" does not suggest that Plaintiff was terminated because of race. Plaintiff identifies no "ambiguous or suggestive comments or conduct" and as discussed *supra*, she has not identified any similarly situated non-Black employees who White Castle treated better than her. Plaintiff contends that White Castle backdated her PIP and fabricated her signatures on her termination form and an unspecified "medical record." (Resp. at 997), but the record is devoid of any evidence to support those accusations. Indeed, Plaintiff's assertion about the termination form is discredited by the evidence as it notes "Team Member Refused Signature." (Termination Form at 899). Accordingly, the record does not reflect any basis for inferring illegal bias motivated White Castle's termination of Plaintiff, which is fatal to her race discrimination claim.

### C. Wrongful Termination (Count VII)

The nature of Plaintiff's wrongful termination claim is not entirely clear from her filings. In her response brief, Plaintiff cites case law concerning FMLA retaliation claims, but she also argues that she "satisfies all three elements" of a "wrongful termination" claim under Illinois law. (Resp. at 991-994). It is also not clear whether Plaintiff brings this claim against both Defendants or White Castle only. Given this lack of clarity, the Court will analyze Count VII under both frameworks and as to both Defendants.

#### 1. FMLA Retaliation

The FMLA prohibits an employer from retaliating against an employee for taking FMLA leave. *See Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) ("We have construed [29 U.S.C. § 2615(a)(2) and (b)] to create a cause of action for retaliation."). Under the FMLA, the term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). Thus, "individuals may be held liable under the FMLA if: (1) the individual had supervisory authority over the plaintiff; and (2) the individual was at least partly responsible for the alleged violation." *Cuff v. Trans States Holdings, Inc.*, 816 F. Supp. 2d 556, 566 (N.D. Ill. 2011).

An FMLA retaliation claim "requires proof of discriminatory or retaliatory intent." *Goelzer*, 604 F.3d at 995. A plaintiff may establish a prima facie case of FMLA retaliation using either a direct or indirect method of proof.[14] *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008). To prevail under the direct method, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) her employer took adverse action against her; and (3) the

[14] The parties analyze Plaintiff's claims using the traditional direct/indirect framework, so the Court will do the same. The Court is mindful that "[r]elevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" *Ortiz*, 834 F.3d at 765.

protected activity caused the adverse action. *Long v. Tchrs.' Ret. Sys. of Ill.*, 585 F.3d 344, 349-350 (7th Cir. 2009). Causation may be demonstrated by either direct or circumstantial evidence. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). Direct evidence "typically involves an admission by the decision maker regarding the retaliatory intent," *id.*, while circumstantial evidence "may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Long*, 585 F.3d at 350.

Under the indirect method, a plaintiff must show "that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Caskey*, 535 F.3d at 593; *see also Hull v. Stoughton Trailers, LLC.*, 445 F.3d 949, 951 (7th Cir. 2006). Once a prima facie case is established, the burden shifts to the employer to state a legitimate, non-discriminatory reason for the adverse employment action. *Caskey*, 535 F.3d at 593. If the employer is successful, the burden shifts back to the plaintiff to show that the proffered explanation is pretextual. *Id.*

Defendants argue that Plaintiff cannot establish a prima facie case under either method of proof. Defendants contend that Plaintiff cannot prove the third element of the direct method because the evidence shows that she was fired for solely performance reasons. (Mem. at 708-710). As to the indirect method, Defendants argue that Plaintiff cannot establish the second and fourth elements because she was not performing her job satisfactorily and cannot show that she was treated less favorably than a similarly situated employee who did not engage in protected activity. (*Id.* at 710). Plaintiff counters that the temporal proximity between her return from FMLA leave and termination are evidence of causation for the direct method; that her performance was

satisfactory; and, again, that she was treated less favorably than employees Stacey Casey and Chesta Desai. (Resp. at 993).

"Temporal proximity between protected activity and an adverse action can be evidence that the action was retaliatory." *Norman v. Donahoe*, No. 14 C 7930, 2016 WL 5373081, at *7 (N.D. Ill. Sept. 26, 2016) (citing *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). At the same time, "[s]uspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). In some instances, "very close" temporal proximity can suffice, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), but whether it is enough "depends on context," *Loudermilk*, 636 F.3d at 316.

Here, the temporal proximity between Plaintiff's FMLA leave and termination is insufficient in light of Plaintiff's declining performance in advance of her taking FMLA leave. "While a sudden decline in performance evaluations after an employee engages in a protected activity may provide circumstantial evidence of discriminatory intent, a decline in performance before the employee engages in protected activity does not allow for an inference of retaliation." *Long*, 585 F.3d at 354. Here, Plaintiff received a "Second Written Warning" in July 2023, and then received a Final Warning and was placed on a PIP in August 2023—months before she went on FMLA leave in November 2023. (DSOF ¶¶ 14, 27-28, 34). Based on these undisputed facts, Plaintiff has not raised a triable issue of fact as to causation.

Moreover, while Plaintiff argues that that she was treated more harshly than general managers Ms. Casey and Ms. Desai, as discussed *supra*, these speculative contentions find no support in the record. Plaintiff further maintains that she was treated less favorably than her supervisor, Ms. Kujat, (Resp. at 993), but she is not a sufficient comparator because Ms. Kujat and

Plaintiff had different jobs, *see Poullard*, 829 F.3d at 855. For these reasons, Plaintiff has not met her burden of establishing a prima facie case of retaliation. Even setting aside the direct and indirect methods of proof, the evidence "as a whole" simply does not permit a reasonable factfinder to conclude that White Castle terminated Plaintiff because she took FMLA leave. *Ortiz*, 834 F.3d at 765. As a result, Plaintiff's FMLA retaliation claim cannot survive summary judgment.

**2. Wrongful Termination**

According to Plaintiff, to establish a claim of wrongful termination under Illinois law, she must demonstrate: (1) "That she engaged in protected activity (e.g., requesting FMLA leave or reporting misconduct)"; (2) "That she suffered an adverse employment action (e.g., termination);" and (3) "That there is a causal connection between the protected activity and the adverse action." (Resp. at 991). Plaintiff asserts that she "satisfies all three elements." (*Id.*). Plaintiff, however, cites no authority for the proposition that "wrongful termination" is a recognized tort under Illinois common law nor that the elements she identifies are consistent with any such claim. In fact, "Illinois does not permit a terminated employee-at will to sue his employer generally for wrongful discharge." *Marron v. Eby-Brown Co., LLC*, No. 11 C 2584, 2012 WL 182234, at *3 (N.D. Ill. Jan. 23, 2012) (internal quotation marks omitted) (quoting *Banks v. Chi. Bd. of Educ.*, 895 F. Supp. 206, 209 (N.D. Ill. 1995)).

Illinois does recognize a cause of action for "retaliatory discharge," but to establish such a claim, a plaintiff "must plead and prove that she was '(1) discharged; (2) in retaliation for her activities; and (3) that the discharge violates a clear mandate of public policy.'" *Thomas v. C.H. Robinson Worldwide, Inc.*, No. 21 C 1275, 2021 WL 10257557, at *2 (C.D. Ill. Dec. 15, 2021) (quoting *Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill. 2d 526, 529 (Ill. 1988)).

Here, Plaintiff does not argue that her discharge violated public policy, and, in any event, she has not pointed to any facts to suggest that it did. Consequently, Defendants are entitled to summary judgment on Count VII.

**D. <u>Violation of Biometric System (Count VIII)</u>**

In support of Count VIII, Plaintiff alleges in her amended complaint that she "ask that she does not be finger print on this matter, she asks for manual document which the Defendant did not provided but assisted that Plaintiff has to use her fingerprint for the document violation of the Plaintiff's rights this is clearly a violation." (FAC at 108). Plaintiff clarifies in her response brief that she asserts a violation of Illinois's Biometric Privacy Information Act (BIPA), 740 ILCS 14/15 *et seq.* (Resp. at 998). The claim appears to be asserted against White Castle only. (*See id.*). Plaintiff "acknowledges signing" White Castle's Biometric Information Privacy Team Member Consent Form (Biometric Consent Form), but she argues that the "form explicitly limited use to I-9 and W-2 verification purposes." (Resp. at 998). According to Plaintiff, "Defendant's later use of Plaintiff's fingerprint data for disciplinary or monitoring purposes exceeded the scope of consent and violates BIPA Sections 15(a) and (b)." (*Id.*).

BIPA regulates the collection, retention, disclosure, and destruction of biometric identifiers or biometric information in Illinois. *See* 740 ILCS 14/15. The statute "is designed to protect consumers against the threat of irreparable privacy harms, identity theft, and other economic injuries arising from the increasing use of biometric identifiers and information by private entities." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 619 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (June 30, 2020). For purposes of BIPA, the term "biometric identifier" is "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. The term "biometric information" is "any information, regardless of how it is

captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.*

Section 15(a) of BIPA requires a private entity in possession of biometric data to develop and publish a written policy establishing a retention schedule and guidelines for permanent destruction when the initial purpose for collecting or obtaining the biometrics has been satisfied or within three years of the individual's last interaction with the entity, whichever occurs first. 740 ILCS 14/15(a). Under Section 15(b), no private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's biometrics, unless it first: (1) informs the person in writing that biometrics are being collected or stored; (2) informs the person in writing of the specific purpose and length of term for which biometrics are being collected, stored, and used; and (3) receives a written release executed by the person. 740 ILCS 14/15(b). Defendants contend that its biometric data policy, reflected in the Biometric Consent Form, complies with these sections of BIPA. (Mem. at 717-718). As explained below, the Court agrees.

Plaintiff's argument that White Castle violated Sections 15(a) and (b) of BIPA is based on a misreading of the Biometric Consent Form and seemingly a misunderstanding of what Sections 15(a) and (b) require. The Biometric Consent Form that Plaintiff signed stated:

> The team member named below has been advised and understands that White Castle System, Inc. and its affiliates ("White Castle") collects, retains, and uses biometric data and/or information for the purpose of identifying a team member's signature when utilizing White Castle's proprietary software. Biometric scanners are computer-based systems that scan a team member's finger for purposes of identification. The computer system extracts unique data points and creates a unique mathematical representation used to verify the team member's identity when the team member, for example, signs a document such as a Form I-9 or Form W-4 or has a need to access secure information systems. White Castle deletes such biometric data and/or information when a team member's employment with White Castle ends.

> The team member understands that he or she is free to decline to provide biometric identifiers and biometric information to White Castle through its biometric software. Electing not to provide such consent will not result in any adverse effects on his or her employment with White Castle. Further, the team member may revoke this consent at any time by notifying White Castle in writing.
>
> The undersigned team member voluntarily consents to White Castle's collection, storage, and use of biometric data and/or information through White Castle's proprietary software, including to the extent that it utilizes the team member's biometric identifiers or biometric information as defines in the Illinois Biometric Information Privacy Act.

(Consent Form at 752). Plaintiff argues that the Biometric Consent Form "explicitly limited use [of biometric data] to I-9 and W-2 verification purposes," (Resp. at 998), but as indicated, the form lists I-9 and W-2 verification as *examples* of situations where an employee's biometrics could be used. In other words, the form does not state that those two contexts are the only permissible uses of biometrics.

Plaintiff's only other argument in support of her BIPA claim is the erroneous assertion that *Cothron v. White Castle System, Inc.*, No. 1:19-cv-382 (N.D. Ill.) (Tharp, J.)—a class-action BIPA lawsuit that White Castle settled in 2024—"underscores Defendant's ongoing noncompliance and supports Plaintiff's position that these factual issues must be tried [by] a jury." (Resp. at 998). The settlement class in *Cothron* was limited to Illinois White Castle employees or former employees "who used a finger-scanning device in the course of their employment without first executing White Castle's Biometric Information Privacy Team Member Consent Form during the Class Period from December 6, 2013 to October 15, 2018." (DSOF ¶ 53). Plaintiff started working for White Castle in June 2019, and there is no dispute that she signed the Biometric Consent Form. (*Id.* ¶¶ 1, 54; Resp. at 998). As such, *Cothron* is irrelevant, and no triable issue exists with respect to Plaintiff's BIPA claim.

**E. Unpaid Wages and Incentives (Count IX)**

Plaintiff's last claim arises under the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1-15. (Resp. at 1001). It appears to be a claim against White Castle only. (*Id.* at 1000).

To prevail on a claim under the IWPCA, a plaintiff must show "that wages or final compensation is due to him or her as an employee from an employer under an employment contract or agreement." *Landers-Scelfo v. Corp. Off. Sys., Inc.*, 356 Ill. App. 3d 1060, 1067 (2d Dist. 2005). Plaintiff contends that "White Castle refused to properly ensure that Plaintiff received her 2023 incentive bonus, despite her store's top performance and her strong leadership." (*Id.*). Defendants counter that Plaintiff was not entitled to an incentive bonus for calendar year 2023 because she was terminated on January 9, 2024, and White Castle's incentive program provides that (1) "incentive awards are distributed approximately six weeks following the end of the year measured"; and (2) participants "terminated for cause prior to receiving the incentive award are not eligible to receive the incentive award even if they would have otherwise qualified." (Mem. at 721; DSOF ¶¶ 59-60). In response, Plaintiff argues that her "purported 'for cause' termination was retaliatory and wrongful," and that White Castle's denial of her bonus "was therefore not based on legitimate policy but instead forms part of the broader pattern of retaliatory and discriminatory actions against Plaintiff." (Resp. at 1000-1001).

As discussed *supra*, Plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that her termination was discriminatory or retaliatory. Thus, Plaintiff cannot show that she was contractually entitled to a 2023 incentive bonus, a requirement for her IWPCA claim. *See Landers-Scelfo*, 356 Ill. App. 3d at 1067.

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is granted.

**DATED**: November 24, 2026

**ENTERED**:

LaShonda A. Hunt

LASHONDA A. HUNT
United States District Judge